JOB A. McWAID ET AL., APPELLANTS, V. BLAIR STATE BANK ET AL., APPELLEES.

FILED JUNE 8, 1899. No. 8694.

1. **Purchase From Trustee.** If a purchaser of property from a trustee has at the time of the purchase notice of the trust, he is charged therewith.

2. ———: NOTICE. The transfer of property to a bank, with the knowledge of an apparent disclosed trust, *held* to have been under such conditions and circumstances that it was without notice, actual or constructive, of a secret trust, and was not placed upon inquiry further than was made of any existent or undisclosed trust.

3. **Conflicting Evidence.** Findings of a trial court on conflicting evidence will not be disturbed unless manifestly wrong.

4. **Bill of Exceptions:** CORRECTIONS. If a bill of exceptions does not

disclose what it was intended to at time of allowance, the trial judge may, after time for its settlement has expired, allow corrections therein to make it fulfill the prior intentions.

APPEAL from the district court of Washington county. Heard below before DICKINSON, J. *Modified.*

*M. A. Hoyt* and *Duffie & Van Dusen*, for appellants.

*Osborn & Aye* and *Francis A. Brogan, contra.*

HARRISON, C. J.

It appears that Daniel W. Archer was, and had been during some considerable time prior to April, 1894, the owner of lots 4 to 15, inclusive, in block 51, in Blair, Washington county, and had thereon a canning factory fitted with the necessary machinery and apparatus, and which he as owner had been operating. During the course of the business he had become indebted to various persons and firms and was probably unable to meet his indebtedness. The plaintiff in this action, in one against D. W. Archer in a court of Iowa, recovered a judgment for about $11,000. Suits by creditors of Daniel W. Archer had been instituted in the court in Washington county, in which writs of attachment had been procured to issue and which had been levied on the factory property and were prosecuted to judgment, and sale of the property had, at which it was purchased by Joseph Jackson, of defendants herein, and the title was conveyed to him by the sheriff. The sale was of date April 14, 1894, and soon thereafter there was formed a corporation, "The Blair Canning Company," to which the factory property was conveyed by Joseph Jackson on July 7, 1894, which was the date of the first meeting of the stockholders of the company. Officers were elected, of whom E. S. Gaylord, the vice-president, was one of the directors of the Blair State Bank and Mr. Kenny, one of the stockholders of the corporation, was a director and also president of the Blair State Bank. The company immediately en-

tered into possession of the factory and made preparation for its operation and for the "pack" of 1894. We will state here that in the record and arguments in the case use is made of the word "pack" to designate all of the product of the factory during a season, also in speaking of corn or peas canned during a season; thus, "The pack of 1894," "The pack of corn 1895," "The pack of peas, season of 1895," and we will employ the word in the same sense in the same connection, if necessary, in the opinion. In September, 1894, the plaintiffs instituted suit in Washington county on their Iowa judgment, against D. W. Archer, and February 26, 1895, were accorded judgment in the amount of $11,978.53, and in June of the same year the present action was commenced, the relief sought being to subject the factory property to sale and apply the proceeds to the payment of the judgment to which we have just referred. The Blair State Bank furnished or loaned to the canning company money to conduct its business operations and had received notes and mortgages, one of the latter being to secure a stated amount of $10,000 and an incumbrance on the real estate of the factory property. Contracts had been entered into with farmers to grow and deliver at the factory the peas and corn which when canned would constitute the "pack" of 1895, and when this suit was commenced all parties concerned in the contracts became anxious that some arrangement be concluded by which the factory might continue in operation through the season of 1895. The bank would not furnish the money, which it was apparent would be needed, unless it could be assured that the factory would be allowed to run during the entire season unmolested and without hindrance by reason of writs or movements in this action. The parties met at Blair, and after consultation a contract, which is known in the record as the contract or agreement of August 9, 1895, was consummated.

The foregoing are some of the main facts and occurrences upon which are predicated the asserted rights of

certain of the litigants in the case at bar.  The plaintiffs were unsuccessful in the. district . court and have appealed.

It is undisputed that Joseph Jackson, when he. became the purchaser of the factory property at the sale by the sheriff, and in his subsequent actions relative to it and its title, did not do so for himself but for another person, for whom he was trustee.  The plaintiffs assert that Jackson was in all he did trustee for Daniel W. Archer, who secured all that was done to be done that he. might thus cover up his property and keep it from his creditors, and particularly the plaintiffs; and further, that the Blair State Bank had full cognizance of. the existent facts and circumstances of the purchase by Jackson and his trusteeship when it loaned the money to the canning factory and took as security for its payment a mortgage on the factory property, which being true, its lien thus created would be subject and inferior to that of creditors of Daniel W. Archer.  Joseph Jackson testified on this subject that he acted in all that he did for J. L. Archer, a brother of Daniel W. Archer; that he was informed and believed that the money with which he paid for the property at the time of the sale was furnished by J. L. Archer, and he did not hear differently or have information of any other nature until the deposition of J. L. Archer, in which appeared statements to the contrary, was taken and filed for use in this suit.  The bank, through its officers, did know that Joseph Jackson had purchased the property, held the title, and conveyed it to the company for some person other than himself, and when they made inquiries, were informed that it was for J. L. Archer.  When the corporation, the canning company, was organized, about two hundred shares of the stock—all of it except five or six shares—was issued to J. L. Archer in consideration, Jackson states, as he and the parties were informed and fully understood at the time, for the factory property, the title to which was then passed to the company.  After a full examination of all the evidence which bears upon

this branch of the case we are satisfied that the bank made its loans and received its mortgages without actual notice of a trust in favor of any other than J. L. Archer, and without cognizance of facts which required further or greater inquiry than it made relative to Joseph Jackson's transactions in respect to the property and the trust under which he acted; hence the trial court was right in its determination on this point in the case.

The contract of August 9, 1895, was in part as follows: "This agreement, made and entered into this 9th day of August, 1895, by and between J. L. Archer, of Chicago, Illinois, D. W. Archer, Job A. McWaid, and Samuel F. Martin, partners under the name of McWaid & Martin, the Blair Canning Company, and the Blair State Bank, witnesseth, as follows:

"Whereas, certain litigation now pending, wherein the said Job A. McWaid and Samuel F. Martin are plaintiffs, and the other parties hereto are among the defendants of said action, the object of which litigation upon the part of the plaintiffs being, among other things, to subject the plant of the Blair Canning Company, of Blair, Nebraska, to the payment of the judgment in favor of said plaintiffs and against said D. W. Archer, and for other relief, and it being deemed advisable and to the best interest of all parties that the said canning factory now controlled by the defendant the Blair Canning Company shall be operated for the purpose of packing the product for the year 1895, and it being necessary to procure money for that purpose, that the same may be safely done it is agreed as follows:

"1st. It is agreed that there shall be no further proceedings of any kind or nature whatever by the said McWaid & Martin against the said defendants for the enforcement of their said judgment during the packing season of 1895, and that all such proceedings shall be suspended so that there shall be no interference with the said canning company in the operation of said factory for the year 1895, and until said pack shall be disposed of, or

with the product of said factory; that the said canning company may, without molestation on the part of the said McWaid & Martin, procure the necessary money and proceed at once to fulfill its contracts with the farmers and others in the purchase of corn, may make said pack, and may pledge said pack as security for any money so borrowed, and the said product may, if so agreed by said canning company, be held as the property of the said Blair State Bank, or other persons furnishing such money, until the expenses incident to the making of said pack and marketing the same, together with debts now existing upon said plant and owing by said canning company, shall be fully paid; and it is agreed that any surplus arising from said pack for the year 1895 above the expenses incident to packing and marketing the same and payment of debts existing against the defendant Blair Canning Company shall be paid over to the said McWaid & Martin, it being the intention of this agreement that all debts now existing against said company or said plant and all expenses which shall be necessarily incurred in the purchasing of corn or other material and making the pack for the year 1895, shall first be paid, including necessary expenditures for salaries and help, and the surplus, if any there be, turned over to the said McWaid & Martin. It is further agreed that the indebtedness from the Blair Canning Company to the Blair State Bank at the close of the business season of 1895 shall not exceed the sum of $7,642.48, and that said indebtedness shall be diminished or cut down or wholly paid off by the profits of the present year, or to the extent that said profits will extend for that purpose; and it is agreed that as fast as said indebtedness shall be paid any liens or incumbrances as disclosed by the public records shall be canceled. * * *

"It is further agreed that the said J. L. Archer and D. W. Archer shall, within five days from the date hereof, cause the stock of the said Blair Canning Company to be delivered to said McWaid & Martin, to be by them held as collateral security to their certain judgment against

the said D. W. Archer, subject, however, to redemption whenever the said judgment shall be satisfied, or until this agreement shall be modified by mutual agreement between the parties. It being understood that the defendant Blair Canning Company shall be and remain in full and complete possession of said plant for the purpose of securing, packing, and selling the product of 1895, including such portion thereof as has been already packed and until such pack shall be marketed; that they shall conduct said business economically and faithfully, and for the best interests of all parties concerned, and make the best disposition of said goods obtainable, and that all parties shall in good faith carry out this agreement. To all of which the parties acknowledge themselves mutually bound, this 9th day of August, 1895."

It is contended for appellees that this agreement recognized the priority of the mortgage of the bank over the judgment of the plaintiffs, and stipulated that the "pack" of 1895 should be sold and the proceeds appropriated to the payment of the claims of the bank, and if not sufficient, then the "plant," as the factory was termed, should be sold and the proceeds, to the extent necessary, be taken by the bank, and the surplus, if any, be paid to plaintiffs. The contract to which we have referred will not bear any such construction. We think in its clear intent it dealt with the pack and its disposition and the proceeds, to whom they should go, and left the question of the liens on the "plant" and their priority to be litigated when by the lapse of time this suit should again be entitled to progress.

It is insisted for appellants that at the time of a conference of the parties prior and preliminary to the agreement of August 9, 1895, at which the terms were mainly spoken of and settled, the bank, by one of its officers, as a basis for the figures which were then made relative to the financial condition of the canning company, stated that its total indebtedness to the bank then was $7,642.48; that said statement, and the belief in its correctness, was

one of the strongest inducements to plaintiffs to make the agreement and exerted quite an influence in that direction; and further, that the bank is now claiming a larger amount due them than was stated, and it should be held estopped to press a claim for the larger sum. There is a conflict in the evidence in relation to what was said and done on the subject of the amount due the bank at the time the parties were together and endeavoring to agree, as they finally did, as set forth in the instrument signed of date August. 9, 1895. The one of appellees who was then present and acting for all of them states in his testimony that it had been ascertained by him and the other parties there that the books of the canning company disclosed an indebtedness to the bank of something more than $13,000; that the officer of the bank who was present (the parties were in the bank or one of its business rooms) observed "that. is not the correct amount," and went into another room, from which he shortly returned and announced that the true amount of the indebtedness was $7,642.48; that this was accepted as correct, and all further conversation and adjustments were with said amount in view as the true one. It was T. E. Stevens, the cashier of the bank, who was with the parties, and he testifies that he does not know whether he ever stated there the gross sum then due the bank, but that it had been obtained from the canning company's books as more than $13,000; that the bank had in its control the "pack" of peas for the season, a large number of empty cans, and there were some other matters which would ultimately develop into credits in favor of the canning company on its indebtedness to the bank and the value of which he was unable to estimate correctly; that they applied the estimated values then as credits and approximately obtained the amount of the indebtedness, which was the sum we have before set forth. When the contract was reduced to writing there was in it a statement to the effect that the amount then due the bank was $7,642.48, but on objection, or probably because not

44

thought to be what was desired, it was stricken out, or
"crossed out," and the language in regard to the amount
named, which was heretofore quoted, was inserted in its
stead. This, it will be remembered, was to the effect that
at the end of the season the indebtedness to the bank
should not be in excess of the sum designated. The
cashier, during the trial, was asked to furnish an
abridged, tabulated statement of the account between
the bank and the canning factory. This he did, and it
was offered and received in evidence without objection.
The appellant who personally took part in the August
9, 1895, contract testifies in regard to the matters, the
values of which the cashier says were estimated and
credited to the canning company, that they were no
further considered in arriving at the conclusions which
finally ripened into an agreement, and there is other
testimony to the same effect, and it is also disclosed that
these matters were disposed of and the actual credits
given the canning company during the subsequent course
of the business during the year 1895, and the early part of
1896. In the testimony of the cashier he said that there
was on August 9, 1895, more than $17,000 due the bank
from the canning company. In his statement of the ac-
count which was received in evidence the amount of said
indebtedness is fixed at $14,840.48, and the estimated
value of the peas and material on hand at $7,198, which
deducted from the given amount of the debt there re-
mains $7,642.48, the sum estimated to be due the bank
August 9, 1895. Preserving these figures and allowing
the credit according to the estimate,—and we are fur-
nished no better basis or figures for this credit,—and
deducting its amount from the receipts from August 9,
1895, to the close of account,—this was when it was
shown to have been received by the bank,—gives us the
amount realized from the disposition of the "pack" of corn
of the season of 1895, which last amount deducted from
the balance due the bank August 9, 1895, plus the amount
loaned to the canning company, also the overdrafts from

August 9, 1895, to the close of the account, and the re-
mainder is $4,024.20, the true amount due the bank on the
indebtedness.   This drops from the calculation $1,588.89
of overdrafts, which, if they existed, were of creation
prior to August 9, 1895.   These, under all the evidence,
we do not think should be considered.   From the $4,024.20
there should be deducted $16.85, a later payment received
by the bank, and we have $4,007.35 due the bank after
the application of this further credit.

It appears that the bank purchased a large number
of cases of canned corn and peas for a total consideration
of $6,313.64, or probably $5,842.30.   This transaction is
attacked by the appellants on the ground that the prices
agreed upon between the canning company and the bank
were too small, and it is urged that the bank should be
charged with a larger sum.   Here it must be said that
there was ample evidence to sustain the finding of the
district court that the agreed prices were fair and the
transaction one which merited approval.   The evidence
discloses that Daniel W. Archer had contracted with a
number of firms and dealers to sell them canned goods,
and it is claimed for appellants, and it was shown in evi-
dence, that he stated on August 9, 1895, that he would
turn these contracts or orders over to the canning com-
pany, which promise, the plaintiffs now say, was one of
the matters by which they were induced to make the
agreement of August 9, 1895, and it is contended that
the bank loaned the company $1,090, which was paid to
Archer as commissions for obtaining these orders; that
this should not have been done and the amount should
now be charged herein against the canning company and
the bank.   Archer did say on August 9, 1895, that he
would give to the company the contracts or orders for
canned goods which he had personally taken.   This he
afterwards refused to do unless paid the sum of $1,090,
and after several attempts to have him keep his promise,
also to take a less sum, it was developed that, all the
facts and circumstances considered, probably the best

thing to do was to pay the commissions, and it was done, and we must approve the finding of the district court that such action was proper and that the bank is not chargeable herein with the sum paid.

Some exhibits were omitted from the bill of exceptions as settled and allowed by the trial judge. That this was true and that thereby the bill was rendered ineffective was urged in the brief filed for appellees. Appellants were allowed on motion to withdraw the bill for presentation to the district judge for amendment. The matter was heard before him and the amendment allowed. From the order of allowance an appeal was taken to this court. Our examination of the record in this appeal convinces us that while some of the facts differ from those in a somewhat similar appeal in the case of *Brennan-Love Co. v. McIntosh*, 56 Neb. 140, the rule therein announced is governable herein, from which it follows that the order of allowance of the amendment will be affirmed.

The decree, with the modification as to the amount hereinbefore indicated, is affirmed.

MODIFIED.